J. George Follett, J.
On December 16, 1969 five children were ordered placed in foster care with the [Commissioner of Social Services of this county. This occurred at a time when the mother of the children was confined to jail on a charge of issuing fraudulent checks. The father of the children was recently deceased.
Since December 16, 1969 various proceedings and hearings have been held concerning1 this family and concerning the mother of these children. On June 2, 1971 the multiple problems confronting the mother were reviewed; and it was then noted, in view of the apparent adoptability of the several children, that a decision must be made at an early date whether or not the case should proceed in the direction of permanent termination of parental rights, or rehabilitation of the children with the mother and stepfather. The instant petition was filed on May 15, 1972.
Various events have caused a delay in the determination of this petition, all of which are set forth in the record and on the summary sheet. The trial has now been completed. The issues *345 to be determined at this time are whether or not paragraphs (a), (b), (c), and (d) as set forth in subdivision 1 of section 614 of theJPamily Court Act have been established by competent proof and a preponderance of the evidence. Section 614 provides as follows: “ 1. A proceeding permanently to terminate the parent’s or other custodian’s custody of a child is originated by a petition, alleging:
“ (a) the child is a person under eighteen years of age;
“(b) the child has been placed in the care of an authorized agency, either in an institution or in a foster home;
“ (c) the authorized agency has made diligent efforts to encourage and strengthen the parental relationship and specifying the efforts made or that such efforts would be detrimental to the moral and temporal welfare of the child and specifying the reasons therefor;
“ (d) the parent or custodian, notwithstanding the agency’s vpfforts, has failed for a period of more -than one year following the placement or commitment of such child in the care of an authorized agency substantially and continuously or repeatedly to maintain contact with and plan for the future of the child although physically and financially able to do so; and
“ (e) the moral and temporal interests of the child require that the parents’ or other custodian’s custody of the child be terminated permanently.”
Paragraphs (a) and (b) of subdivision 1 of section 614 are not in. dispute. Paragraph (e) is pertinent to the dispositional hearing. The central issue of this case concerns paragraphs (c) and (d).
The wording of paragraph (c) of1 subdivision 1 of section 614 was amended in 1971 (L. 1971, ch. 901) by the addition of the words “ or that such efforts would be detrimental to the moral and temporal welfare of the child and specifying the reasons therefor”. This case requires an interpretation of this language.
Clearly, if a parent presents a history of child abuse or conduct injurious to the emotioinal well-being of the child, it may be said that efforts to encourage and strengthen the parental relationship would be 11 detrimental to the moral and temporal welfare of the child ”. The facts of this case do not go so far. Here the parental conduct toward the children is neglectful, not abusive. It is characterized by misfeasance, not malfeasance. However, there is no indication that the Legislature intended the 1971 amendment to be applicable only in cases of parental abuse or malfeasance.
*346 Furthermore, the statute must be interpreted in light of the various efforts the Legislature has made in recent years to prevent children from becoming permanently lost in foster care. These efforts are traced in Matter of Barbara P. (71 Misc 2d 965, 969) where the consequences of this trend are noted as follows: “ Each step taken toward this end by the Legislature and the courts creates rights of children which in turn deprive parents of traditional immunities from custodial consequences for failure to fulfill their duties as parents. Increasingly the correlative rights of children and the duties of parents are thus 'becoming articulated. The task of implementation still lies ahead.
‘ ‘ While the legislation can provide guidelines for adjudicating the question of permanent neglect and can provide safeguards to assure due process, there can be no single or final definition that will encompass the myriad variations in the social histories, parental attitudes or actions, the conditions of the parents and the life prospects for the child. Adjudication on a case by case basis is essential if the conflicting claims of parents and children are to be justly evaluated and determined.”
In this case the respondent has failed to make any effort to maintain contact with her children; she has seen them at most no more than three times in three years; she has displayed exceedingly poor judgment in the selection of her second husband, a man with a long record of criminal violence; she has displayed a gross inability to manage her finances; she has been committed to jail a second time for issuing fraudulent checks; she has been diagnosed as having “ little ability to cope witii everyday life”. Viewing the totality of these circum-■ stances (Matter of Klug, 32 A D 2d 915), the department was justified in concluding that an effort to “ encourage and strengthen the parental relationship ” would at best only create an artificial appearance of family unity which would not endure the test of time. Furthermore, in the process of such an effort, the children would be the subject of an experiment to determine whether or not this woman could function as an adequate mother. If the experiment failed, the children could suffer a crushing rejection. It would not appear to be the legislative intent that children, who have been once before traumatized by parental neglect and rejection, should be made the subject of such an experiment.
I therefore find that upon the facts of this case efforts made to strengthen the parent-child relationship would be detrimental to the moral and temporal welfare of the children. The depart *347 ment was justified in concluding when it did that efforts to rehabilitate the children with the mother would be futile and would only lull both mother and children into a harmfully false belief that reconciliation would occur in the future.
Furthermore, the record of disinterest displayed by the mother adequately supports the conclusion required by the statute that the mother has failed for a period of more than one year following placement of her children to substantially and continuously or repeatedly maintain contact with and plan for their future although she was physically and financially able so to do.
The requirements for a fact-finding determination having been met, the case must now be scheduled for a dispositional hearing. (Family Ct. Act, § 625.)
Obviously this young woman has labored under many handicaps, not the least of which has been a most unsuccessful second marriage. Also, in recent months, she has shown some degree of greater responsibility than she had demonstrated earlier. However, that should now be considered in connection with a determination of whether or not the moral and temporal interest of the children requires that the mother’s custody of the children be permanently terminated. The matter should therefore be scheduled for dispositional hearing.
In this connection, the Department of Social Services is to file with the court within 30 days a current report on the present circumstances of the respondent. This report should also discuss the current physical, mental and emotional circumstances of each child 'with particular reference to whether or not the child is adoptable, the interest of the foster parents in adoption and whether or not there are any relatives of the child who would be interested in caring for the child either on a long-term basis or through adoption. The report should note any special needs of each child as well as the relationship which exists between the children, with relatives and with foster parents. Also, the report should discuss the benefit which might be derived in this case from an order of suspended judgment under section 633 of the Family Court Act.
The case is to be scheduled after 30 days.
Dispositional Hearing, January 9, 1974
The issue presented in this case is whether or not the moral and temporal interests of four children require that their parents’ custody be terminated permanently.
The deficiencies of Barbara Wood Boshane as a parent were noted in the findings of fact at the conclusion of the fact-finding hearing in this proceeding. Adding to the difficulties therein *348 noted, Mrs. Boshane has now lost her jóh, she is separated from her husband, she has again moved at least twice since the fact-finding decision, and she has recenly given birth to another Child. Her instability and her other limitations demand that she be closely monitored in her child-care practices with her newborn, infant. Considering the needs of her several children in foster care and her limitations, it is clear that none of these children can be returned to her in the foreseeable future.
I have noted her lawyer’s argument that intensive efforts at rehabilitation be undertaken with the hope that at least some of these children might be reunited with their mother. However, the time for such effort has long since passed. This should have been done during the first year and one half of placement. Admittedly, the department failed in its obligation at that time. However, as noted in the fact-finding decision, to undertake such an effort at this time would only hazard the raising of expectations on the part of the children without promise of success. The additional trauma which would befall the children upon the failure of such an effort negates the making of the effort.
Even though none of these children can be returned to the care of their mother, it does not necessarily follow that parental rights should be permanently terminated. The circumstances of each child must be examined and a separate decision made as to each of them.
KIMBERLY
Kimberly, at age 13, is the oldest of the four children in foster care. Her Law Guardian reports her IQ as being 58%, from information which apparently was furnished by the school system which she attends. In 1969, the St. Lawrence County Mental Health Clinic reported her IQ to be 69. In 1971, another evaluator determined her IQ to be 46. Without question, she is retarded. For the last year and one half she has been living in a foster home certified by the Sunmount State Hospital. She is well accepted in that home, and seems to be making some progress in school. The plan for this young lady is continued foster care, supervision, and vocational training until “ she is capable of self care ”. Whether or not this young lady will ever become “ capable of self care ” is highly problematical. She will need close supervision and guidance. The foster family should be given generous support in meeting Kimberly’s special needs in order that she achieve her maximum potential. In any event she is not a candidate for adoption.
The department wishes parental ties to be terminated in order that there be no interference with the long-range supervision *349 and planning for this young woman. It is also argued that it would be easier to explain to Kimberly the reasons for her mother’s failure to visit if her mother no longer had the right to visit. However, Mrs. Boshane has not in any way interfered with the foster care of this young girl during the last four years. It is not at all likely that she will commence to interfere at this time. On the other hand, Kimberly does have some contact with her grandmother and occasional contact with other relatives. The Law Guardian does not recommend permanent termination as to Kimberly. Careful planning might involve some of her relatives in a meaningful role in her future. For this reason alone, termination is not indicated.
Since a petition to extend custody has been pending along with the petition for permanent termination of parental rights, and since the facts adduced at both the fact-finding stage and at this stage of this proceeding clearly demonstrate the mother’s inability to care for this child, an order should be entered continuing placement of Kimberly in the Department of Social Services for one year from this date.
ARNOLD, JR.
Arnold, Jr. is now 10 years old, having been born on July 27, 1963. Arnold seems to have made a good adjustment in foster care after some initial problems. Both the Department of Social Services and the Law Guardian recommend permanent termination of parental rights and adoptive placement. However, the Law Guardian conditions his recommendation upon the need for finding a suitable adoptive placement for this young man.
The problem with this recommendation is the ties which this young man has with his siblings and relatives. The reports indicate that Arnold has on occasion visited with his grandmother and an aunt. He also sees his brother, Steven, regularly at school. There is an indication that he has been in contact with his sister, Kimberly.
Nevertheless, these interrelations do not necessarily negate the need for permanent termination of1 parental rights. The caseworker suggests that both Arnold, Jr. and his brother, Steven, be placed at the same adoptive home; or if that is not possible, that they be placed near each other where they can maintain contact. Considering the age of these two young men, this plan may not be realistic even though substantial benefit would likely accrue to them if they could in fact ,be placed in the same adoptive home. If such a plan is not feasible, then permanent termination serves no useful purpose; -and the chil *350 dren would be better off in their present foster setting, maintaining contact as they have in the past. For these reasons, judgment is suspended pursuant to section 631 of the Family Court Act for a period of six months. The Department of .Social Services is instructed to make an intensive effort to locate a suitable adoptive placement situation and to report to the court. If additional time is required, the department should apply for an extension of the order of suspended judgment. If a suitable adoptive placement can .be located, then an order will be entered permanently terminating parental rights as to Arnold.
STEVEN
■Steven will shortly be 9 years of age, having been born on January 27, ¡1965. After displaying severe deprivation at the time of his placement in foster care in 1971, he has since overcome many of his initial handicaps and is described as being a handsome, appealing, healthy boy who is emotionally stable.
He apparently has no emotional ties with his mother whatsoever. However, he does and has had regular contact with his grandmother and a maternal aunt, .Martha 0 ’Shea. This is the same aunt who has had contact with Arnold, Jr. He also sees his brother, Arnold, Jr., regularly as they attend the same school.
Because of these contacts with his brother, his aunt, and his grandmother, the same reasoning applies to this young man as would apply to Arnold. Judgment should be suspended for a period of six months, and the department is directed to locate a suitable adoptive placement for both Steven and his brother, Arnold, Jr. If no such home can be located after diligent search, an acceptable alternative would be adoption into different homes in the Same community where they can continue to maintain contact. If no adoptive placement can be located, it would not seem that permanent termination of parental rights is of sufficient benefit to this young man to offset his present family relationship.
■NANCY
Nancy is the youngest of the Wood children, having been born on October 12, 1967. She has lived in foster care almost four years and apparently has no memory of her living situation before foster placement. Furthermore, she has been maintained in the Same foster home throughout her placement.
Although she had many initial handicaps at the time of foster placement, she apparently has made excellent progress in overcoming these handicaps and is now described as being friendly, *351 outgoing, attractive and without emotional problems. It is unfortunate that the foster parents do not desire to adopt Nancy, as this is the only home she now knows.
Mr. and Mrs. Robert Joseph Clement have expressed an interest in adopting Nancy. Mr. Clement is the child’-s maternal uncle. The preliminary investigation into this plan indicates that this might be a suitable adoptive placement for this child. In any event, it would seem Nancy is in fact adoptable. She has no ties with her mother and apparently has seen her mother only once in four years. Nor does she have any ties with her siblings or other relatives. For these reasons an order should be entered permanently terminating the parental rights as to Nancy, with a direction that Mr. and Mrs. Robert Clement be considered among possible adoptive placements. The department is directed to report to the court within three months on the progress of the adoptive placement of Nancy.