OPINION OF THE COURT
J. George Follett, J.
There are pending before the court petitions for extension of placement under article 10 of the Family Court Act relating to Corinne Hirsch, Jacqueline Andress, John Andress, and Donna Andress. There is also pending a petition for permanent termination of parental rights under part 1 of article 6 of the Family Court Act, in relation to Donna Andress. The principle matter in contention at the fact-finding phase of the case is the permanent termination petition concerning Donna. That matter will be addressed first.
The facts are developed from the oral testimony taken at the trial as well as the extensive exhibits which were introduced into evidence. Also, the court will take judicial notice in this proceeding of its own prior orders and decisions. (Matter of Denlow, 87 Misc 2d 410, and cases cited therein.)
The following facts are found and determined by a clear preponderance of the competent and credible evidence. Donna, who was born on May 31, 1973, and is now almost five, entered foster care on March 4, 1974, when she was just over *401 nine months of age. She was placed in the Hutton foster home where she has remained to the present day. From March of 1974 until August of 1976 her older sister Jacqueline, age 7 in 1974, also lived in the Hutton foster home. The mother visited several times in 1974 then did not visit again until two years later in the summer of 1976. After several visits in the summer and early fall of 1976, she failed to visit thereafter. She testifies that she wishes her former husband, the father of the child, to have custody of the child.
The mother has repeatedly failed to inform the agency of her whereabouts for periods of time greatly in excess of six months. (Social Services Law, § 384-b, subd 7, par [e].) The case record of the Department of Social Services documents the efforts made by the agency to locate the mother at various times and in particular following the disappearance of Donna’s half-sister, Corinne, from her foster home in November of 1976. Whether or not the mother assisted in the removal of that child from the foster home is not clear. However, it is eminently clear that the mother knew of the whereabouts of the child in the vicinity of Buffalo and failed to notify the Department of Social Services or co-operate in any way. The mother’s whereabouts was unknown during the time Corinne was missing from November 30, 1976, to August 3, 1977.
The father, has maintained reasonably regular contact with Donna since the child entered foster care. There was some break in the visits during 1977 apparently associated with the breakdown of his most recent marriage. However, this is not considered of consequence considering the past history of visitation at considerable expense and effort on his part.
Regardless of the contacts by the natural parents, the child has developed a strong psychological tie to the foster parents. Dr. Linda Rapp, a developmental psychologist, testified that the bond between the child and the foster parents commenced to form when the child was still in her early developmental years at age 10 months. She stated that the child looks to the foster parents as the only significant adult figures in her life. She urged against any attempt to break the bond between the child and the foster parents, stating that it would be detrimental to the child’s best interests to attempt to do so. She concluded that if this were done, the child would be faced with adjustment reactions including acting out behavior, depression, and inadequate self-concept development which would cause the child serious difficulties throughout her life. She *402 noted that if the child should be moved to an unstable home then the consequences for the child likely would be even more detrimental.
The child exhibited acting out behavior and experienced nightmares, screaming, and bed wetting following visits by the father to the foster home. The child refused to kiss the father and clearly does not acknowledge him as a parent figure. Furthermore, the child has a very strong bond of attachment to a foster sibling, Beverly, a natural child of the foster parents. To remove the child from this home would mean not only uprooting the child from the adults that she views as parents but also from another child that she views as a sister.
The Department of Social Services and the foster parents in this case argue that the agency should be excused from making diligent efforts to encourage and strengthen the parental relationship as such efforts would be detrimental to the best interest of the child (Social Services Law, § 384-b, subd 7, par [a]). They point to the prolonged care of the child by the foster parents and rely on the doctrine set forth by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543). The Court of Appeals in Bennett v Jeffreys (p 550) determined that among the extraordinary circumstánces justifying the withholding of the custody of a child from a natural parent is where the child has been "so long in the custody of the nonparent that, even though there has been no abandonment or persisting neglect by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child.” The court concludes that where such extraordinary circumstances are shown, the court should then examine into the best interests of the child to determine whether the parent or nonparent should receive custody.
That the doctrine of Bennett v Jeffreys is applicable in cases of permanent termination of parental rights is established by the decision of the Court of Appeals in Matter of Sanjivini K. (40 NY2d 1025). The Appellate Division has followed the direction of the Court of Appeals in applying the Bennett v Jeffreys doctrine to a permanent termination case in Matter of Leticia Rose M. (54 AD2d 909; cf. Matter of Kim Marie J., 59 AD2d 716).
Applying these principles it is clear that the prolonged residence of this child with the foster parents presents such extraordinary circumstances under the facts of this case as would excuse the agency from making the diligent efforts *403 which the statute otherwise requires. Here the child was just slightly over nine months of age when placed in the foster home. The child is now almost five years of age. The child has lived for over four fifths of her lifetime with the foster parents and has understandably formed deep psychological ties to them. For much of that period, the same factors cited by the Court of Appeals in Bennett v Jeffreys (40 NY2d 543, 550, supra), the lack of an established household by both parents, an unwed state, and the attachment of the child to the foster parents, are present in this case as well.
There remains to be considered the requirements of section 614 (subd 1, par [d]) of the Family Court Act requiring the agency to prove that the parents, notwithstanding the agency’s efforts, have failed for more than one year following the date the child came into care to maintain contact with or plan for the future of the child although physically and financially able to do so. It is clear from the evidence that the mother’s contacts with the child have been so insubstantial as not to merit meaningful consideration. Furthermore, she has utterly and totally failed to plan for the return of the child preferring instead to pursue her own more immediate needs and desires.
The father however, has maintained regular contact which cannot be said to be either insubstantial or infrequent. (Social Services Law, § 384-b, subd 7, par [b].) However, the planning and contact requirements of the statute must be read in the disjunctive (Matter of Orlando F. (40 NY2d 103). Here the father’s plan for this child is clearly inadequate and simplistic at best. His job keeps him away from home for most of the day when his children are at home and awake. Donna will shortly be entering school meaning that the father would actually care for the child only for an hour or so in the morning before the child left for school. The balance of the child’s waking day would be spent in school or in the care of the babysitter except for Sundays. The babysitting program for the children who are presently in the father’s care has been haphazard at best since his separation from his present wife.
Of even more serious concern is the total failure of the father to perceive the needs of this child in relation to the strong psychological ties which the child has for the foster parents. If removed, the child’s separation trauma would be considerable. This the father passes off simply by saying that *404 the child would make an early adjustment to his care. It cannot be said on the facts here presented, that the father’s plan is either realistic or feasible (Social Services Law, § 384-b, subd 7, par [c]).
Furthermore, a careful scrutiny of the statutory scheme relating to permanent termination of parental rights appears to relieve the agency from the requirement of proving lack of contact or lack of planning where diligent efforts are excused as being contrary to the best interests of the child. The provision excusing diligent efforts was added originally by chapter 901 of the Laws of 1971. The history of that amendment was traced by this court in Matter of Raymond "M” (81 Misc 2d 70, 74-76). As noted in that case, the 1971 amendment was adopted to overcome the dilemma presented to the Trial Judge in Matter of Clear (58 Misc 2d 699, revd and remanded sub nom. Matter of Klug, 32 AD2d 915, reh and petition granted 65 Misc 2d 323).
The language of the amendment was added at the end of the definition of a "permanently neglected child”. (Social Services Law, § 384-b, subd 7, par [a], formerly Family Ct Act, § 611.) This is a logical place to add the wording; however, it does cause confusion in interpretation particularly when read with section 614 of the Family Court Act.
Applying the exception only to the diligent efforts requirement would mean that the parent would be expected to plan for the return of the child but without agency help. The agency would be relieved from helping the parent for the reason that diligent efforts would be detrimental to the welfare of the child. This is an unlikely legislative intent. Reading the amendment as an exception to the contact and planning requirement as well as the diligent efforts requirement resolves what would otherwise become an anomaly in the law.
Furthermore, it is only by applying the exception to the entire definition that the decision of the Court of Appeals in Matter of Sanjivini K. (40 NY2d 1025, supra) mandating the application of the Bennett v Jeffreys doctrine to permanent termination cases can be implemented without gross violence to the statutory scheme.
From the foregoing, it is the conclusion of this court that the petitioner has met the burden imposed upon it by the statute at the fact-finding portion of the permanent termination case. The case should be scheduled for dispositional hearing to determine whether or not it is in the best interests *405 of the child that the parental rights should be permanently terminated. (Family Ct Act, § 614, subd 1, par [e].)
At such a hearing, the court will consider the extension petitions on this child and the other children. Also at that time the court would like to hear evidence concerning the current circumstances of the mother, the father, and the two children in his care. The details of the breakup of the father’s most recent marriage is a matter which should be explored.
Furthermore, the Department of Social Services is to present a dispositional summary in the usual form required in cases of this sort with a copy to the attorney for each party at least 10 days in advance of the dispositional return date.